IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CORNELIUS SPENCER                                                    PLAINTIFF
ADC #117794

V.                          Case No. 4:23-cv-00893-ERE

DEXTER PAYNE, *et al.*                                              DEFENDANTS

<u>ORDER OF DISMISSAL</u>

## I.    <u>Overview</u>

On September 25, 2023, *pro se* plaintiff Cornelius Spencer, an inmate housed at the East Arkansas Regional Unit ("EARU") of the Arkansas Division of Correction ("ADC"), filed this lawsuit under § 1983. *Doc. 2*. On December 14, with leave of Court, he filed a supplement to his complaint. *Docs. 26, 27*.

Mr. Spencer, who has been diagnosed with depression and antisocial personality disorder, alleges that ADC officials and medical personnel violated his constitutional rights by: (1) denying his requests to be released from solitary confinement; (2) failing to provide him opportunities for out-of-cell exercise, either indoors or outdoors, for a two-year period; and (3) failing to provide him with adequate mental health care.

Mr. Spencer names as Defendants Director Dexter Payne, Assistant Director William F. Straughn, Warden Moses Jackson, and Deputy Warden Michael Richardson (collectively "ADC Defendants") and mental health staff members

Timothy Owen, Natasha Hammock, and Gary Smith ("Medical Defendants"). He sues each Defendant in his or her individual and official capacities, seeking monetary damages, a declaration that his rights are "being violated," and unspecified injunctive relief. *Doc. 2 at 9.*

Pending before the Court are the ADC and Medical Defendants' motions for summary judgment, supporting briefs, and statements of fact. *Docs. 123, 124, 125, 140, 141, 142.* Mr. Spencer has responded to both motions (*Docs. 132, 146, 147, 148*), which are now ripe for review.

For the reasons explained below, the Court grants Defendants' motions for summary judgment.

## II.   **Summary Judgment Standard**

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must come forward with specific facts demonstrating a material dispute for trial. *See* FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

A party is entitled to summary judgment if -- but only if -- the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017).

## III.  <u>Background</u>

### A.  **Exhausted Claims**

Mr. Spencer proceeds with the following exhausted claims against the ADC Defendants: (1) Defendants Jackson and Richardson denied his requests to be released from solitary confinement; and (2) Defendants Payne, Straughn, Jackson, and Richardson failed to provide him with opportunities for out-of-cell exercise, whether indoors or outdoors, for a two-year period. *Doc. 82 at 6-7, 11-12.* Mr. Spencer argues that the complained-of conduct violated his rights under the Fourteenth Amendment's Due Process Clause and Eighth Amendment's Cruel and Unusual Punishment Clause.[1] *Docs. 2 at 4-6*; *26 at 1-3.*

As for his claims against the Medical Defendants, Mr. Spencer argues that Defendants Owen, Hammock, and Smith demonstrated deliberate indifference to his

---

[1] In his deposition and brief in opposition to the ADC Defendants' motion for summary judgment, Mr. Spencer suggests that *if* ADC officials allowed other inmates to participate in yard call during the two-year period at issue, they discriminated against him by denying him the same opportunity. *Doc. 140-1 at 11*; *Doc. 147 at 9*. Mr. Spencer did not plead an equal protection claim, and he alleges no facts suggesting that ADC Defendants treated him differently than any other similarly situated inmate. *Phillips v. Norris*, 320 F.3d 844, 848 (8th Cir. 2003) (noting that absent assertion of membership in a protected class or violation of a fundamental right, an inmate's equal protection claim requires a showing that similarly situated inmates received different treatment, and the difference in treatment had no rational relation to any legitimate penal interest).

serious mental health needs in violation of the Eighth Amendment by ignoring the condition of his mental health and his requests for transfer to the general population or another ADC unit. *Doc. 82 at 4-6, 11*; *Doc. 63-7 at 3* (grievance EAM-23-1022).

Consistent with the scope of Mr. Spencer's exhausted claims, the relevant facts, viewed in a light most favorable to him, follow.

### B.    Solitary Confinement

Before Mr. Spencer's incarceration, he was diagnosed with antisocial personality disorder and depression and prescribed Wellbutrin. *Docs. 2 at 4*; *125-1 at 1*; *134 at 1*. He was also injured in a car accident that left his right arm, below the elbow, paralyzed. *Docs. 140-1 at 10*; *147 at 6*.

When Mr. Spencer filed this lawsuit on September 25, 2023, he had lived in EARU restrictive housing ("RH"), i.e., solitary confinement, for four years in a one-man cell that measures 7'6" x 11', a total 85.5 square feet. *Docs. 140-4 at 11-23*; *140-5 at 2,7*; *140-6.* Fixtures in RH cells include a sleeping surface, sink and toilet. *Doc. 140-6*.

Mr. Spencer was initially assigned to RH after he received major disciplinaries for resisting apprehension, insolence to a staff member, and assault. *Doc. 140-4 at 23.* During his time in RH, Mr. Spencer repeatedly has received additional major disciplinaries. *Id. at 11-23*.

ADC policy provides that upon determining that an inmate poses a direct

threat to the safety of others or presents a clear threat to safe and secure prison operations, the shift supervisor on duty may place the inmate in RH. *Doc. 140-2 at 2*. Within 24 hours, a higher-ranking officer, not involved with initial decision, must approve of the placement decision. *Id*. If the inmate is retained in RH, the deciding officer must then refer the placement decision to the next regularly scheduled meeting of the Classification Committee, and the inmate must receive notice of the hearing at least 24 hours before a classification hearing and an opportunity to appear and present evidence. A majority vote of the Committee is required to keep an inmate in RH. *Id at 3*.

The Classification Committee or authorized staff must review the status of every inmate assigned to RH every seven days for the first 60 days, and every 30 days thereafter. *Doc. 140-2 at 3*. No inmate may remain in RH for more than one year unless the Warden, personally, has interviewed the inmate and approved continued assignment to RH. *Id. at 4*. After two years in RH, and each year thereafter, the Warden and Deputy Director must personally interview the inmate to determine whether the assignment is "necessary and appropriate." *Id*.

ADC records show that from the time of his initial placement in RH up to the date he filed this lawsuit, Mr. Spencer's RH placement was periodically reviewed as required by the foregoing procedures, and Mr. Spencer does not assert otherwise. *Doc. 410-4 at 12-15*.

Mr. Spencer has consistently but unsuccessfully advocated for his release from solitary confinement. On June 15, 2022, he attended a classification hearing and requested release to the general population, but the Classification Committee denied his request. *Doc. 2 at 4-5*. On September 28, 2022, Defendant Jackson conducted a Warden review of Mr. Spencer's RH assignment, and he determined that it should not change. *Docs. 140-4 at 15*; *140-2 at 4*. In his initial complaint, Mr. Spencer alleged that during the review, Defendant Jackson promised that if MR. Spencer remained disciplinary-free for 60 days, he would consider releasing him to the general population. *Doc. 2 at 5*. However, in deposition, Mr. Spencer recalled a different promise:

> I went up for a Warden review, [and] Moses Jackson said himself, if you stay disciplinary free, give me *six months*, I'll recommend you back to population, directly from him. Then I went for a Director's review after that and they said stay out of trouble, you know, [and] we'll see you go back to population. I did all that.

*Doc. 140-1 at 8* (emphasis added). It is undisputed that during the six-month period following the September 28, 2022 Warden review, Mr. Spencer accumulated two major disciplinary violations, resulting in his continued RH assignment. *Docs. 140-3 at 2*; *140-5 at 14*.

On November 30, 2022, Mr. Spencer sent a request to Defendant Jackson asking for release to the general population. *Doc. 2 at 5*. On January 7, 2023, Defendant Jackson denied the request. *Id. at 6*.

On January 30, 2023, Mr. Spencer submitted another request to Defendant Jackson seeking release from solitary confinement. *Id. at 6-7*. On February 8, 2023, Defendant Jackson responded to Mr. Spencer's request stating, "request noted." *Id. at 7*.

### C.    Outdoor Recreation

ADC Administrative Directive 2021-15 ("AD 2021-15") provides that RH inmates receive a minimum of one hour of out-of-cell exercise per day, five days a week, "unless security or safety dictates otherwise." *Doc. 140-7 at 4*. As for outdoor exercise,  AD 2021-15 states: "Opportunities may be available to exercise outdoors, weather permitting. Reasons for the imposition of any constraints should be documented in the log and justified in writing." *Id*.

RH prisoners also leave their cells three times a week for showers. *Id. at 4*. However, when a prisoner leaves RH for any reason, he must wear leg restraints and be escorted to and from his destination by two officers. *Id*.

In March 2020, the ADC implemented COVID-19 pandemic restrictions that remained in place until the beginning of 2021 and limited the movement of inmates within the EARU. *Doc. 140-5 at 2*. Even after initial COVID-19 restrictions were eased, the pandemic caused persistent staff shortages that significantly reduced the number of officers available to escort RH prisoners. *Id. at 3*. As a result, EARU officials prioritized sanitations, showers, and sick call over out-of-cell exercise

opportunities. *Doc. 140-5 at 3*. ADC yard call logs show that from September 2021 through September 2023, both staff shortages and construction operations in the yard area limited yard call to a few prison areas each day on a rotating basis. *Doc. 140-9.*

In his verified complaint filed September 25, 2023, Mr. Spencer alleged that he did not "go outside his cell for exercise and outside recreation for almost two (2) years due to shutting down outside recreation entirely and out of the cell exercise for a period of time." *Doc. 2 at 5*. The relevant period for this claim is the two-year period encompassed by Mr. Spencer's exhausted grievance EAM-20-902: May 22, 2021 through May 22, 2023. *Doc. 82 at 12* (Order permitting Mr. Spencer to proceed on claim that ADC Grievance Defendants denied yard call or outdoor activity raised in grievance EAM-20-902); *Doc 63-10 at 3* (grievance EAM-20-902 filed May 22, 2023 alleging no outside recreation for "going on two years").

Defendants present no evidence that Mr. Spencer received opportunities for indoor, out-of-cell exercise during the two-year period. As a result, for summary judgment purposes, Mr. Spencer is assumed to have received no opportunities for indoor, out-of-cell exercise for a continuous two-year period. As for opportunities for outdoor exercise or "yard call," Defendants present no records for 248 of the 730 days within the two-year period.[2] For summary judgment purposes, Mr. Spencer is

_____

[2] *Doc. 141 at 9-10*. For relevant dates in 2021, the ADC has no yard call records for May 22-31, June 1-30, July 1-31, and August 1-31. *Id.* For 2022, the ADC has no yard call records for June 26, 27, 28, 29; August 2, 4-31; September 1-30; and October 11, 2022. *Id.* For 2023, the ADC

assumed to have received no opportunities to go outdoors for those 248 days. For the remaining 482 days, ADC yard call records show that Mr. Spencer had the opportunity to participate in yard call only eleven days, and each opportunity occurred in 2022.[3] Mr. Spencer refused yard call nine of the eleven times he had the opportunity to go outside.[4]

In his deposition,[5] Mr. Spencer acknowledged that when he had no opportunity to exercise outside of his cell, he exercised in his cell to "build his muscles back." *Doc. 140-1 at 6*. He testified that despite the paralysis in his lower right arm, his in-cell exercise is a "nice set of a workout" that includes one-arm pushups, one-arm burpees, jumping jacks, and squats. *Id*.

Finally, Mr. Spencer stated that extended periods with no out-of-cell exercise or time outdoors exacerbated his mental health issues and caused him to suffer from

---

has no yard call records for January 11, 12; March 1-17, 19-31; April 1-30; and May 2-22. *Id.*

[3] Mr. Spencer received yard call opportunities on the following dates in 2022: January 20 and 31; March 31, April 14; May 19; June 19, 21, and 27; and October 2, 12, and 31. *Id*. He received no yard call opportunities from January 1 through May 22, 2023. *Id*.

[4] Mr. Spencer refused yard call on January 20 and 31, March 31, June 19, 21, and 27, and October 4, 13, and 31, 2022. *Id. at 8*. The records provided do not indicate the reason(s) Mr. Spencer declined to go outside on these days. *Doc. 140-8*.
In deposition, Mr. Spencer stated, "The majority of the time I go to yard call, the majority of the time. I want the fresh air the majority of the time. There [are] not too many times I can recall I refused yard call. If I have, it might be once or twice, but not that many. I might be asleep and too tired if they come early in the morning [,] and I say I'm going to go on and miss a day, I'll catch the next one next week." *140-1 at 12*.

[5] Mr. Spencer was deposed on August 24, 2024, at which time, he was still housed in solitary confinement with once-a-week yard call. *Doc. 140-1 at 4, 5.*

vitamin D deficiency. *Doc. 140-1 at 9*; *2 at 4*. He argues that his injuries exist even though they "will not be visible as a broken arm, black eye or catching the flu." *Doc. 147 at 8*. However, as outlined in more detail below, undisputed medical records establish that during the relevant time period, medical personnel consistently visited and evaluated Mr. Spencer and reported that his mental and physical health remained stable.

### D.    Mental Health Care

Between October 13, 2020 and August 16, 2023, Dr. Kittrell (a non-party) conducted eight telemedicine encounters with Mr. Spencer.[6] Dr. Kittrell's reports for those encounters fail to indicate that Mr. Spencer ever complained about a lack of outdoor recreation or its impact on his mental health. Instead, Dr. Kittrell wrote that Mr. Spencer: (1) reported no dangerous or intolerable medication side effects; (2) denied suicidal or homicidal ideation; (3) denied hallucinations; (4) had received a number of disciplinary charges but denied suicidal or homicidal ideation or hallucinations; (5) advised that fluoxetine was not effective (contradicting his earlier

---

[6] The telemedicine meetings occurred October 13, 2020, March 9, September 28, 2021; March 1, May 31, August 30, November 29, 2022; and May 23, 2023. *Docs. 125-2*; *125-7*; *125-13*; *125-15*; *125-17*; *125-19*; *125-22*; *125-28.*

On June 8, 2021, Dr. Kittrell could not evaluate Mr. Spencer due to a power outage, but he reviewed Mr. Spencer's case management file and determined that he should stay on his current medication. *Doc. 125-8 at 1*. On February 28 and August 15, 2023, Dr. Kittrell could not examine Mr. Spencer due to security issues, but on both dates, he renewed Mr. Spencer's fluoxetine prescription. *Docs. 125-22 at 1*; *125-32 at 1.*

statements) and requested venlafaxine (Effexor);[7] (6) reported lack of perceived benefit from paroxetine, but failed to report targetable psychiatric symptoms; (7) reported he was better on fluoxetine than paroxetine and was noticeably brighter; and (8) reported some benefit from taking fluoxetine. *Docs. 125-2 at 2*; *125-7 at 1*; *125-15*; *125-17*; *125-19*; *125-22*; *125-28*.

After his telemedicine encounters with Mr. Spencer, Dr. Kittrell took the following actions: (1) renewed Mr. Spencer's fluoxetine prescription;[8] (2) increased his fluoxetine prescription to help with Mr. Spencer's irritability;[9] and (3) discontinued fluoxetine and prescribed paroxetine.[10]

On November 5 and December 3, 2020, Lori Reeves (a non-party) saw Mr. Spencer for his mental health case management session. *Docs. 125-3 at 1*; *125-4 at 1*. During those encounters, Mr. Spencer voiced no mental health concerns, told Nurse Reeves that his medication was "helpful" (*Doc. 125-3 at 1*), and stated that he was doing "fine." *Doc. 125-4 at 1*.

---

[7] Dr. Kittrell found Mr. Spencer's request concerning due to "one or more inmates in MAX [] hoarding venlafaxine and perhaps selling it." *Doc. 125-13 at 2*.

[8] *Docs. 125-2 at 1*; *125-15 at 1*; *125-17 at 1*; *125-19 at 1*; *125-22 at 1*; *125-28 at 1*.

[9] *Doc. 125-7 at 1*.

[10] *Doc. 125-13 at 1-2*.

On January 20, 2021, February 3, 2021, and around December 9, 2021, Theresa Washington (a non-party) saw Mr. Spencer for his mental health case management session. During those encounters, Mr. Spencer reported that he was "doing good" and "eating and sleeping fine," and he voiced no mental health concerns. *Docs. 125-5 at 1*; *125-6 at 2*; *125-14 at 1.*

 On July 21, 2021 Carmelita Haynes (a non-party) saw Mr. Spencer for his mental health case management session. Mr. Spencer told her he was doing "ok" but could "do better if [he] exercised[d] more." *Doc. 125-9 at 1-2*. However, there is no indication that Mr. Spencer complained that he was not receiving opportunities for outdoor recreation or that Ms. Haynes notified a named Defendants about Mr. Spencer's comment about exercise.

On July 26, 2021 Lisa Reed (a non-party) saw Mr. Spencer during a mental health segregation visit. *Doc. 125-10 at 3*. During this visit, Mr. Spencer requested to consult a psychiatrist about his medications. *Id*.

On July 28, 2021 Erin Whitfield (a non-party) saw Mr. Spencer during a mental health segregation visit. Mr. Spencer told Ms. Whitfield that his mental health medication was not working, and he requested a prescription for Effexor. *Id. at 2*.

On August 4, 2021 Jonathon Wiscaver (a non-party) examined Mr. Spencer for his mental health case management session. *Doc. 125-11 at 1*. Mr. Spencer

reported that things were going "ok" and denied any mental health issues, but he stated that his medication was "not helping at all." *Id*. The encounter notes state: "He is currently prescribed [f]luoxetine . . . . [T]he current medication order expires on 8/8/2021." *Id*.

On September 1, 2021, Defendant Owen saw Mr. Spencer for a mental health case management session. *Doc. 125-12 at 1*. Mr. Spencer "report[ed] medication compliance with no side effects," but he requested that his prescription be changed to Effexor." *Id*. Mr. Spencer provided no reason for the requested medication change other than his "personal preference." *Id*.

On April 21, 2022, Defendant Hammock saw Mr. Spencer, who appeared calm and interactive during that encounter. *Doc. 125-16 at 2*.

On June 6, July 11 and August 8, 2022, Defendant Hammock saw Mr. Spencer for mental health case management sessions, where Mr. Spencer reported that his medication was effective. *Doc. 125-18 at 1-4*.

On September 20, 2022, Defendant Smith saw Mr. Spencer for a mental health management session. *Doc. 125-20*. At that time, Mr. Spencer voiced concerns about his safety at EARU and requested to be transferred. *Id. at 1*. Defendant Smith reported that Mr. Spencer was "rude" and "uncooperative" and terminated the interview "due to lack of cooperation." *Id*.

On October 24 and November 3, 2022, Defendant Smith saw Mr. Spencer for

mental health management sessions. *Doc. 125-21*. Both times, Mr. Spencer refused to cooperate with Defendant Smith and requested that Defendant Hammock serve as his mental health advisor. However, Defendant Smith noted that Mr. Spencer's mental status appeared to be within "normal limit[s]." *Id. at 2, 4*.

On December 20, 2022, January 18, 2023, and February 27, 2023, Defendant Smith saw Mr. Spencer for his case management sessions. *Doc. 125-23*. During each encounter, Mr. Spencer refused to cooperate with Defendant Smith, who noted that Mr. Spencer's mental status appeared to be within normal limits. *Id. at 1, 3, 5*.

On March 29, April 26, May 8, and June 9, 2023, Defendant Smith examined Mr. Spencer during case management sessions. *Docs. 125-25*; *125-26*; *125-27*; *125-29*. Mr. Spencer's mental status was within normal limits, and Defendant Smith detected no "signs of distress." *Docs. 125-25 at 2*; *125-26 at 1*; *125-27 at 1*; *125-29 at 1*.

On July 11, 2023, Defendant Hammock saw Mr. Spencer for "Crisis Intervention." *Doc. 125- 30 at 1*. Mr. Spencer reported that he did not receive his medication for three to four days and "felt depressed." *Id*. Defendant Hammock consulted Dr. Rushefsky, counseled Mr. Spencer, and assessed Mr. Spencer "to be of low risk for self-harm." *Id. at 2*.

On July 14, 2023, Defendant Smith examined Mr. Spencer for a case management session, where Mr. Spencer complained that the nurses had not

consistently provided his daily medication. *Doc. 125-21 at 2*. However, Mr. Spencer's mental status was within normal limits and Defendant Smith did not detect any "signs of distress." *Id.*

On August 16, 2023 Defendant Smith saw Mr. Spencer for his case management session. *Doc. 125-33*. Defendant Smith noted that Mr. Spencer's mental status was within normal limits and Mr. Smith did not detect any "signs of distress." *Id. at 2.*

## IV.    ADC Defendants' Motion for Summary Judgment

### A.    Sovereign Immunity

The ADC Defendants correctly assert that Mr. Spencer's claims against them in their official capacities for money damages are barred either by the sovereign immunity of the states, recognized in the Eleventh Amendment, or because state officers sued in their official capacities are not "persons" subject to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71(1989).

### B.    Qualified Immunity

The ADC Defendants assert qualified immunity as to claims against them in their individual capacities. Qualified immunity protects government officials from suits for damages under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At

the summary judgment stage, a defendant is entitled to qualified immunity unless: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). "District courts may address these two questions in any order but may not deny qualified immunity without answering both questions in the plaintiff's favor." *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014) (citation omitted). A court must make an individualized assessment of each defendant's entitlement to qualified immunity. *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 805–06 (8th Cir. 2010).

### 1.    Solitary Confinement

Mr. Spencer alleges that Defendants Jackson and Richardson violated his Fourteenth Amendment right to due process by denying his requests to be released from solitary confinement. As explained below, his allegations fail to demonstrate the deprivation of a constitutional right and therefore fail to overcome the assertion of qualified immunity.

Solitary confinement, even without cause, does not automatically trigger due process protections. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003). To prevail on a due process claim, Mr. Spencer must first show that his RH placement amounted

to a deprivation of liberty[11] because it imposed an "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484-85 (1995). Only with this showing is it necessary to consider whether the plaintiff received the process required to protect the liberty interest at issue. *Williams v. Hobbs*, 662 F.3d 994, 1000 (8th Cir. 2011).

Mr. Spencer alleges that being housed in solitary confinement caused his mental health to worsen, but he alleges no facts showing that the conditions of his restrictive housing, compared to conditions in the general population, imposed an atypical and significant hardship. In fact, he acknowledges that during the period when he received no opportunities to go outside, no yard call was conducted in any area of the EARU for any inmates. *Doc. 148 at 5*.

Even assuming that the duration of Mr. Spencer's RH placement and extended periods with no out-of-cell exercise gave rise to a liberty interest in avoiding RH placement, his due process claim is without merit because the procedures employed here met due process requirements.

The Eighth Circuit has held that a transfer to administrative segregation requires only informal due process procedures. *Spann v. Lombardi*, 65 F.4th 987,

---

[11] The Due Process Clause of the Fourteenth Amendment states: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Because Mr. Spencer was not deprived of life and does not allege a deprivation of property, he must rely on a deprivation of his liberty.

992 (8th Cir. 2023). Specifically, "[a]n inmate must be given an opportunity to present his views to a neutral decisionmaker but is not entitled to a hearing with the inmate present." *Spann v. Lombardi*, 65 F.4th 987, 992 (8th Cir. 2023) (cleaned up and citations omitted). "If the prison chooses to hold hearings, inmates do not have a constitutional right to call witnesses or to require prison officials to interview witnesses." *Id.* Informal due process also requires a periodic review of placement in administrative segregation. *Id.*

The ADC's policies and procedures met the foregoing requirements,[12] and Mr. Spencer does not contend they were not followed or that he did not receive meaningful review during the period he was in RH. Instead, he argues that his RH placement was not warranted. However, the Due Process Clause does not guarantee against incorrect or ill-advised placement decisions. *Hamner v. Burls*, 937 F.3d 1171, 1180 (8th Cir. 2019) ("Hamner identifies no circuit precedent holding that an inadequate justification for administrative segregation or shortcomings in review of a prisoner's placement violate the Due Process Clause.").

### 2.    Outdoor Recreation

Mr. Spencer contends that each ADC Defendant violated his Eighth Amendment right against cruel and unusual punishment by denying him out-of-cell

---

[12] See *supra* discussion at Section III.B.

exercise opportunities for two years.

The Constitution "does not mandate comfortable prisons," but it prohibits "inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be objectively, sufficiently serious, resulting in denial of the "minimal civilized measure of life's necessities." *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 342 (1981)). Second, the prison official's conduct must reflect a subjective state of mind showing deliberate indifference to the health or safety of the prisoner. *Id*. (citations omitted). Specifically, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id. at 837*.

The record, viewed most favorably to Mr. Spencer, shows that he was held in solitary confinement for four years, two years of which he received no opportunities for indoor, out-of-cell exercise and only eleven opportunities for outdoor exercise. A serious question arises as to whether Mr. Spencer suffered an objectively serious deprivation of humane conditions of confinement during this two-year period.[13]

---

[13] To the extent that Mr. Spencer contends that the ADC Defendants failed to follow AD

Defendants correctly observe that neither the Supreme Court nor the Eighth Circuit has recognized a rigid, stand-alone constitutional right to outdoor exercise in the prison setting.[14] However, Mr. Spencer does not confine his claim to lack of outdoor exercise. He alleges that no opportunities to exercise outside of his cell, either indoors or outdoors, combined with his solitary confinement and mental health issues, which include depression and anti-social personality disorder, worked together to violate the Eighth Amendment. The Supreme Court has explained that conditions of confinement may sometimes interact to deprive a prisoner of a basic need, such as exercise:

> *Some* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth,

---

2021-15, which states that RH inmates should receive a one hour of out-of-cell exercise five days a week, unless security or safety dictates otherwise, it is well settled that the failure to follow prison policy or procedure does not by itself state a constitutional claim. *McClinton v. Arkansas Dept. of Correction*, No. 05-2498, 2006 WL 304470, at *1 (8th Cir. Feb. 9, 2006)

[14] In *Roos v. Clark*, No. 419CV00895-BRW-PSH, 2022 WL 4229981, at *10 (E.D. Ark. Aug. 26, 2022), *report and recommendation adopted*, 2022 WL 4225965 (E.D. Ark. Sept. 13, 2022), an inmate claimed that the prison warden violated the Eighth Amendment by refusing to provide him daily or regular outdoor exposure to the sun. In recommending dismissal of the claim on the basis of qualified immunity, United States Magistrate Judge Patricia Harris addressed the plaintiff's argument that it was well established that inmates are entitled to outdoor recreation under the Eighth Amendment:

> The Court's review of relevant case law indicates that there is not a robust consensus that an inmate has a right to *outdoor* exercise for purposes of the Eighth Amendment. While that right is clearly established in the Ninth and Tenth Circuits, it has been questioned in at least the Fifth and Seventh Circuits.

*Roos*, 2022 WL 4229981, at *10 (internal citations omitted).

> or exercise—for example, a low cell temperature at night combined
> with a failure to issue blankets.

*Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991).

Out-of-cell or outdoor exercise may be constitutionally required depending on the circumstances. For example, outdoor exercise may be required when an inmate is confined 24 hours a day to a small cell that does not accommodate exercise, but not required if the cell size accommodates exercise and the inmate has the opportunity to leave his cell for other purposes. Compare *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (holding outdoor exercise required when prisoners confined in small cells almost 24 hours per day), with *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (finding no Eighth Amendment violation with 45 minutes of out-of-cell exercise per week and opportunities to exercise in 7 x 9 a cell and leave cell 30 minutes a week for showers).

In *Wishon v. Gammon*, 978 F.2d 446 (8th Cir. 1992), the Eighth Circuit instructed:

> In considering an alleged deprivation of adequate exercise, courts must
> consider several factors including: (1) the opportunity to be out of the
> cell; (2) the availability of recreation within the cell; (3) the size of the
> cell; and (4) the duration of confinement. On the other hand, lack of
> exercise may be a constitutional violation if one's muscles are allowed
> to atrophy or if an inmate's health is threatened.

*Id*. at 449 (internal citations omitted).

Here, Mr. Spencer had the opportunity to leave his cell for showers and exercise in his cell and does not claim to have suffered any muscle atrophy. In fact, physician notes from an October 29, 2021 hospital visit note that Mr. Spencer was a "well developed, well-nourished inmate."[15] *Doc. 140-10 at 236*.

I have serious concerns about the prolonged, two-year period of almost no opportunities for out-of-cell exercise or outdoor recreation in this case. However, after carefully considering the *Wishon* factors and the factual record, I find that Mr. Spencer is unable to establish that objectively, his deprivation resulted in the denial of the "minimal civilized measure of life's necessities."

In addition, Mr. Spencer fails to support the subjective component of an Eighth Amendment claim. First, he offers no evidence that any of the ADC Defendants had specific knowledge that he did not receive out-of-cell exercise opportunities for a two-year period. Second, it is undisputed that Mr. Spencer's reduced opportunities for out-of-cell exercise were not imposed to punish him but resulted from the prison's response to staff shortages. Mr. Spencer argues that prison officials should have come up with a better solution to address staff shortages that did not result in reduced opportunities for out-of-cell exercise. *Docs. 149-1 at 7*; *148 at 5*. However, as the Supreme Court has long held, "To be cruel and unusual

---

[15] *Doc. 140-10 at 236.* From October 29, 2021 until November 9, 2021, Mr. Spencer was hospitalized due to complications from COVID. *Doc. 140-10 at 236-242*.

punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991) (cleaned up) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Instead, the offending conduct must be wanton, and whether conduct is wanton depends on the circumstances facing the prison official. *Id.* at 302-303.

Based on the current record, no reasonable juror could find that any ADC Defendant acted with wanton disregard for Mr. Spencer's health and safety by denying him the opportunity to participate in yard call during the relevant time period. Each ADC Defendant is entitled to qualified immunity on Mr. Spencer's claims against them.[16]

## V.    <u>Medical Defendants' Motion for Summary Judgment</u>[17]

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (omitting quotations and citation). At the summary judgment stage, Mr. Spencer "must clear a substantial evidentiary threshold" showing that Defendants

---

[16] Mr. Spencer's claims for declaratory and injunctive relief also fail. To be entitled to a declaratory judgment, Mr. Spencer must seek protection against "some future conduct, not simply to proclaim liability for a past act." *Justice Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 764 (8th Cir. 2019) (citation omitted). The same is true for a prospective injunction: Mr. Spencer's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). He has failed to present any evidence that he is likely to suffer any future injury as a result of any specific Defendant's conduct.

[17] In support of their motion, the Medical Defendants argue only that Mr. Spencer's medical deliberate indifference claims fail as a matter of law.

knew of but deliberately disregarded his serious medical needs. *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019).

An inadvertent or negligent failure to provide adequate medical care does not amount to deliberate indifference. *Id. at 575*. Instead, deliberate indifference requires culpability akin to criminal recklessness, which is more blameworthy than negligence but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Based on the undisputed evidence, no reasonable juror could conclude that any of the Medical Defendants were deliberately indifferent to Mr. Spencer's mental health needs. To the contrary, the Medical Defendants consistently monitored and evaluated Mr. Spencer and provided him prescription medication to address his mental health needs. Such conduct can hardly be described as criminally reckless. In addition, Mr. Spencer has not presented any evidence that any Medical Defendant: (1) had the authority to transfer him to the general population or another ADC unit; (2) had knowledge that he been denied outdoor recreation for an extended time; or (3) had knowledge his mental health symptoms had been aggravated by the lack of outdoor recreation.

On this factual record, no reasonable juror could find that any Medical Defendant acted with deliberate indifference to Mr. Spencer's serious mental health needs.

24

## VI.    <u>Conclusion</u>

IT IS THEREFORE ORDERED THAT:

1.    Defendants' motions for summary judgment (*Doc. 123, 140*) are GRANTED, and judgment is entered in favor of Defendants.

2.    Mr. Spencer's claims are DISMISSED, with prejudice.

3.    The Clerk is instructed to close this case.

Dated 27 May 2025.


_____
UNITED STATES MAGISTRATE JUDGE